# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3721

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

LLOYD BALDWIN,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 99 CR 294—**Blanche M. Manning**, *Judge.*

———————

ARGUED NOVEMBER 3, 2004—DECIDED JULY 12, 2005

———————

Before FLAUM, *Chief Judge*, and EASTERBROOK and SYKES,
*Circuit Judges*.

SYKES, *Circuit Judge.* Lloyd Baldwin was convicted of
four counts of wire fraud for his involvement in a phony
"prime bank funding program" that successfully separated
Joe Piscopo from $3 million of his money. Baldwin's first
contention on appeal is that one count of the indictment
was returned *one day* after the statute of limitations on that
offense had expired. No one noticed this at the time,
although the parties now agree that Count 1 was untimely.
Because the statute of limitations argument was never

raised in the district court, our review is for plain error. Baldwin's sentence on Count 1 is concurrent to the other counts, so the only additional punishment imposed on the admittedly untimely count is the $100 special assessment, which is not serious enough to warrant correction as plain error. *See United States v. McCarter*, 406 F.3d 460, 464 (7th Cir. 2005).

Baldwin also challenges the sufficiency of the evidence to convict, but he has not carried his heavy burden on this argument. Finally, Baldwin challenges aspects of his sentence and the district court's restitution order. The district court initially sentenced Baldwin to four concurrent 78-month terms of imprisonment, well below the 20-year statutory maximum in effect when Baldwin was before the court. But Baldwin's frauds occurred in the mid-1990s when the statutory maximum for wire fraud was only five years. Realizing its mistake, the court corrected the sentence, but it did so well beyond the seven-day time period for correcting an erroneous sentence under Federal Rule of Criminal Procedure 35(a). We therefore vacate Baldwin's sentence and remand for resentencing. Not everything needs to be redone, however. We reject Baldwin's challenge to the district court's imposition of a two-level sentence enhancement under the Sentencing Guidelines for abuse of a position of trust. We also reject his argument that the district court's $3 million restitution order violates the Ex Post Facto Clause of the Constitution.

## I. Background

Joseph Piscopo met Lloyd Baldwin at a trade show in the early 1970s when both men were working in the computer software industry. Piscopo later hired Baldwin as a vice president in the firm he owned; after two years in that position, Baldwin left on good terms. The two men kept in touch and in 1993 Baldwin approached Piscopo with an

investment opportunity that he called a "prime bank funding program." The pitch was simple and, it turned out, completely fraudulent. Baldwin said he would raise $40 million from various individuals and loan the money to unnamed "large-scale" European banks, which would use it to fund their cash reserves. Baldwin promised Piscopo that if he agreed to invest, he would reap a 12% return on a three-week investment or a 36% return on a nine-week investment. Baldwin offered his "personal guarantee" of the investment and assured Piscopo that his principal would "never be at risk." Baldwin also told Piscopo that by channeling the proceeds through various corporate entities Baldwin set up in the Cayman Islands, profits on the plan would be tax free. Piscopo fell for it.

Piscopo signed a joint venture agreement with one Floyd Reeves, an associate of Baldwin, and agreed to invest $1 million in the "program" for a minimum of three weeks and a maximum of nine weeks, for an expected maximum return of 36%. He wired the funds to a bank account in Spain owned by Reeves. Within days more than $950,000 of the money was transferred from Reeves' account to two accounts in New York, and within a week only 8¢ remained in the Spanish bank account. Where the money went from there is unclear.

As the end of the investment period approached, Baldwin told Piscopo that the "program" had done even better than expected and that Piscopo stood to earn a 40.4% profit. Encouraged by the good news, Piscopo agreed to reinvest his $1,404,000 and invest an additional $2 million in a new "program" on the same terms. To that end Piscopo signed another joint venture agreement, this time with Daric Corporation, one of the Cayman Islands companies set up and controlled by Baldwin. The terms of the agreement were the same as before. In addition, Piscopo was promised that the $2 million principal was guaranteed by a company called Equity Funding, another entity controlled by

Baldwin. On October 20, 1993, Piscopo wired $2 million from a bank account in Chicago to an offshore European bank account owned by Daric Corporation. Unbeknownst to Piscopo, the funds were then immediately wired to a bank account controlled by Baldwin in the Cayman Islands. No money was ever invested in European bank reserve funds.

Near the end of the second investment period, in January 1994, Piscopo told Baldwin that he did not want to roll over his earnings again and instructed Baldwin to return the funds. Over the next 21 months Baldwin prevaricated, offering Piscopo a slew of excuses why the money, though perfectly "safe," could not yet be returned. Near the end of 1995 Piscopo told Baldwin that he was considering legal action and Baldwin then disappeared. Piscopo never received a return of his $3 million investment.

A grand jury was convened to investigate Baldwin's activities. The investigation required evidence from Spain, so the government requested a court order pursuant to 18 U.S.C. § 3292 suspending the five-year statute of limitations prescribed by 18 U.S.C. § 3282. *See* 18 U.S.C. § 3292 (empowering the district courts to suspend statutes of limitations during the time required for the United States to gather evidence from foreign countries). On October 29, 1998, Acting Chief Judge Charles Kocoras issued a sealed, ex parte order suspending the running of the statute of limitations from September 29, 1997 (the date the government formally requested Spain's assistance), to June 1, 1998 (the date on which Spain took final action on the government's request). On April 21, 1999, the grand jury issued an indictment charging Baldwin with four counts of wire fraud in violation of 18 U.S.C. § 1343 in connection with his scheme to defraud Piscopo. The offense charged in Count 1 occurred on October 20, 1993; Count 2 on April 14, 1994; Count 3 on May 24, 1994; and Count 4 on July 15, 1994. As the government now concedes, and as will be

discussed more fully below, the indictment was returned one day after the expiration of the extended statute of limitations on Count 1.

Baldwin did not raise the statute of limitations argument in the district court. He waived a jury trial and the case was tried to the court, United States District Judge Blanche Manning, presiding. On May 30, 2003, Judge Manning issued a written decision convicting Baldwin on all four counts. On October 2, 2003, the case proceeded to sentencing and the court applied U.S.S.G. § 2F1.1 (1995), applicable to offenses involving fraud or deceit. To a base offense level of 6 the judge added 13 levels for the amount of loss (it being more than $2.5 million but less than $5 million). The judge also added two levels each for Baldwin's role in the offense, more than minimal planning, violation of a position of trust, and providing false testimony at trial, yielding a total adjusted offense level of 27. In light of Baldwin's criminal history category of I, the Guidelines prescribed a sentencing range of 70 to 87 months. Declining the government's request for an upward departure based on uncharged relevant conduct, the district court selected a sentence roughly in the middle of the guidelines range and imposed four concurrent 78-month terms of imprisonment followed by a three-year term of supervised release.

Although this sentence was far below the 20-year maximum set by the version of 18 U.S.C. § 1343 in effect at the time he was sentenced, Baldwin's convictions stemmed from acts that occurred when the statutory maximum was only five years. *See* 18 U.S.C. § 1343 (1995); Pub. L. No. 107-204, § 903(b) (2002). Baldwin's sentence was therefore illegal. The government informed the court of the mistake; on January 16, 2004, the judge amended the sentence. She imposed a 60-month term of imprisonment on Count 1 and three concurrent 18-month terms of imprisonment on the remaining counts, to run consecutive to the 60 months on Count 1. In this way the judge preserved the original total

of 78 months' imprisonment while staying within the statutory maximum on each count. Baldwin timely appealed.

## II. Discussion

### A. Challenges to Convictions

#### 1. Statute of Limitations on Count 1

The statute of limitations for wire fraud is five years and begins to run on the date the illegal communication is sent. 18 U.S.C. § 3282; *United States v. Tadros*, 310 F.3d 999, 1006 (7th Cir. 2002) (each wire is a separate offense). Count 1 of Baldwin's indictment was based on Baldwin's October 20, 1993, wire transmission of the $2 million he fraudulently induced Piscopo to transfer to the Daric Corporation account. As noted earlier, Acting Chief Judge Kocoras ordered a suspension of the statute of limitations pursuant to 18 U.S.C. § 3292 for a period of approximately seven months. Under 18 U.S.C. § 3292(c)(2), however, when foreign authorities take final action on the United States' request for evidence before the untolled statute of limitations would have expired, the judicial suspension cannot exceed six months. The Spanish authorities took final action on the government's request before the statute of limitations would otherwise have expired, so the limitations period on Baldwin's wire fraud of October 20, 1993, was suspended for six months.

As the government now concedes, the $2 million wire transfer that Piscopo sent on October 20, 1993, occurred five years, six months *and one day* before the grand jury returned its indictment on April 21, 1999.[1] Expiration of the

---

[1] Baldwin also contends that the statute of limitations expired on Count 2 of the indictment, but he has apparently miscalculated. Count 2 charged wire fraud in connection with a letter sent by Baldwin to Piscopo on April 14, 1994. The indictment was re-

(continued...)

statute of limitations is an affirmative defense, not a bar to jurisdiction, *United States v. Meeker*, 701 F.2d 685, 687 (7th Cir. 1983), so Baldwin's failure to raise the issue before trial means that he is at best entitled only to plain-error review.[2] *See United States v. Ross*, 77 F.3d 1525, 1537 (7th Cir. 1996) (according plain-error review to an unraised statute of limitations objection but finding no error in case before the court). As we have noted, Baldwin was originally sentenced to four concurrent 78-month terms of imprisonment, an

---

[1] (...continued)
turned five years and one week later, well within the statute of limitations as lengthened by virtue of Acting Chief Judge Kocoras' order.

[2] We say "at best" because there is an argument, not made by the government, that under FED. R. CRIM. P. 12(b)(3) Baldwin has waived and not merely forfeited his statute of limitations defense. Rule 12(b)(3) specifies motions that must be made before trial; the rule includes motions "alleging a defect in instituting the prosecution" or "a defect in the indictment or information." Rule 12(e) provides that matters covered by Rule 12(b)(3) that are not raised by the pretrial motion deadline set by the court are waived, subject to the district court's authority to grant relief from the waiver "[f]or good cause." Other circuits apply Rule 12(b)(3) and the waiver rule of (e) to statute of limitations arguments. *United States v. Ramirez*, 324 F.3d 1225, 1228-29 (11th Cir. 2003); *United States v. Gallup*, 812 F.2d 1271, 1280 (10th Cir. 1987). In this circuit, statute of limitations arguments not timely raised in the district court are considered forfeited, not waived, and are accorded plain-error review. *United States v. Ross*, 77 F.3d 1525, 1536 (7th Cir. 1996). The holding in *Ross* is premised upon certain language in the advisory committee note to Rule 12(b) suggesting that a statute of limitations defense is among those matters that *may*, not *must*, be raised by pretrial motion. *Id.* The government has not argued that *Ross* should be revisited in light of the clear text of the rule and the apparent conflict with other circuits; the government cited *Ross* for the proposition that Baldwin's statute of limitations argument should be considered forfeited and reviewed for plain error.

illegal sentence because each count was subject to a five-year statutory maximum. The district court later corrected the error, but (as we will discuss in a moment) the order correcting the sentence came too late and the district court lacked authority to enter it. *See* Part B.1., *infra.*

Accordingly, we have before us the original concurrent sentences; under this court's recent decision in *McCarter*, 406 F.3d at 464, an error that results only in a concurrent sentence does not warrant correction as a plain error. We acknowledged in *McCarter* that "because a defendant must pay a separate $100 'special assessment' (paid into the Crime Victims Fund) for each felony, concurrent prison sentences do now result in additional punishment." *Id.* (citations omitted). But we held that the assessment is "a trivial fee," the erroneous imposition of which "is not a serious enough error to be described as a miscarriage of justice and thus constitute plain error." *Id.*

Baldwin argues that allowing a tardy prosecution under the circumstances of this case raises concerns about the witnesses' memories and only serves to encourage dilatory investigations by law enforcement, thereby implicating the fairness and integrity of the judicial proceeding within the meaning of the plain-error test of *United States v. Olano*, 507 U.S. 725, 736 (1993). These arguments are unpersuasive given that the indictment was only one day late. *McCarter* applies here, and the statute of limitations violation does not qualify as plain error warranting correction under the circumstances of this case.

### 2. Sufficiency of the Evidence

Baldwin challenges the sufficiency of the evidence used to convict him—a tough row to hoe considering that we will affirm a conviction if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

(1979); *see also United States v. Seawood*, 172 F.3d 986, 988 (7th Cir. 1999) (characterizing burden of proof on challenges to sufficiency of the evidence "a nearly insurmountable hurdle"). To establish a violation of the federal wire fraud statute, the government must prove that the defendant: (1) participated in a scheme to defraud; (2) had an intent to defraud; and (3) used the wires in furtherance of the fraudulent scheme. *United States v. Masten*, 170 F.3d 790, 794 (7th Cir. 1999). Baldwin contends that the government presented insufficient evidence to prove that he intended to defraud Piscopo.

The contention is without merit. The government's case consisted of documentary evidence, expert testimony, and witnesses with firsthand knowledge of Baldwin's fraudulent activities. The court saw bank records detailing the various transactions involved. A law professor with expertise in commercial and financial fraud examined the documents and agreements and testified that Baldwin's scheme had many of the hallmarks of a "prime investment scam." He explained that it is not possible to instruct banks to designate funds for their reserves. Banks (including European banks) do not solicit short-term deposits from private investors to keep their reserves up; they borrow from other banks and government institutions. The government also presented the testimony of John Mathewson, chairman of the Cayman Islands bank where Piscopo's $2 million were deposited after initially being wired to the offshore European bank. The district court found Mathewson's testimony credible because it was supported by documents admitted into evidence, despite the fact that Mathewson had himself pleaded guilty to money laundering and tax evasion in a separate proceeding. Mathewson testified about his relationship with Baldwin and Yolanda Wong, one of Baldwin's confederates who received $100,000 of Piscopo's money. Mathewson testified that Baldwin and Wong were the only people with access to the account into

which Piscopo's $2 million had been deposited, and he detailed the various payments they made with that money—payments to Baldwin's friends, to credit card companies, and payments for other personal expenses.

Baldwin testified in his own defense and offered a litany of excuses that the district court judge characterized as "not only incredible but border[ing] on the absurd." Baldwin claimed to have been a victim of the fraud rather than its perpetrator; he continued to blame various unnamed individuals who supposedly orchestrated the scheme and had true control over Piscopo's money. For instance, Baldwin claimed that the money was held in trust by a man known to him only as "Mr. 24." Baldwin insisted that he had no real knowledge of financial matters, despite having talked up his skill with money to Piscopo on multiple occasions. We find not the slightest reason to question the conclusion of the district court that the government proved its case against Baldwin beyond a reasonable doubt.

## B. Sentencing Issues

### 1. Correction of Sentence

Rule 35(a) of the Federal Rules of Criminal Procedure provides that "[w]ithin 7 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error." FED. R. CRIM. P. 35(a). Federal Rule of Criminal Procedure 45(b)(2) further states: "The court may not extend the time to take any action under Rules 29, 33, 34, and 35, except as stated in those rules." There is no provision in Rule 35 for an extension of the seven-day period for correcting a sentence. The Supreme Court has held that these rules operate to deprive the court of authority to act after the time period specified in the rule has elapsed. *See Carlisle v. United States*, 517 U.S. 416, 428 (1996) (district courts have no "inherent power" to act in contravention of applicable rules of procedure).

The district court sentenced Baldwin on October 2, 2003. Excluding two intermediate weekends (as Federal Rule of Criminal Procedure 45(a) requires), the seven-day period for correcting the court's "clear error"—and there is no dispute that the 78-month sentences constituted clear error— ended on October 13, 2003. The court had no authority to correct Baldwin's sentence beyond that date. We therefore vacate the revised sentence imposed on January 16, 2004, and remand for resentencing.[3]

### 2. Sentence Enhancement for Abuse of Position of Trust

The Sentencing Guidelines provide for a two-level enhancement if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." *United States v. Gould*, 983 F.2d 92, 94 (7th Cir. 1993); *see also* U.S.S.G. § 3B1.3. The district court applied this enhancement because it found that Baldwin held himself out to be a legitimate investment broker and that

---

[3] In supplemental briefing to this court, the parties debated the effect on Baldwin's sentence of *United States v. Booker,* 125 S. Ct. 738 (2005). Baldwin did not raise a *Booker*-type argument in the district court and therefore plain-error review would apply. *United States v. Paladino,* 401 F.3d 471, 481 (7th Cir. 2005). Had there been no basis to disturb Baldwin's sentence for other reasons, we would have remanded the case to the district court for a statement on whether under the now-advisory Sentencing Guidelines the court would have imposed a lesser sentence. *Id.* at 483-84. But Baldwin must be resentenced because his original sentence exceeded the statutory maximum and the district court's correction of the erroneous sentence came too late. Upon resentencing, of course, the district court will be operating under the new sentencing regime in which the Sentencing Guidelines are advisory. *Booker,* 125 S. Ct. at 765.

he represented the prime bank lending "program" as a legitimate and safe investment vehicle.

Whether Baldwin occupied a position of trust is a question of fact that we review for clear error. *United States v. Boyle*, 10 F.3d 485, 489 (7th Cir. 1993); *see also United States v. Beith*, 407 F.3d 881, 891 (7th Cir. 2005) (factual findings under Sentencing Guidelines continue to be reviewed for clear error after *United States v. Booker*, 125 S. Ct. 738 (2005)). However, the interpretation of the term "position of trust" is a legal question that we determine without deference to the district court. *Boyle*, 10 F.3d at 489. In determining whether the defendant abused a position of trust, we analyze the circumstances from the perspective of the victim. *United States v. Hathcoat*, 30 F.3d 913, 919 (7th Cir. 1994) (citing *United States v. Hill*, 915 F.2d 502, 506 n.3 (9th Cir. 1990)). In addition, "the sentencing court must look beyond formal labels to the relationship between the victim and the defendant and the responsibility entrusted by the victim to the defendant." *United States v. Davuluri*, 239 F.3d 902, 908 (7th Cir. 2001).

Baldwin contends that applying the enhancement under the facts of this case is tantamount to applying it to every case of fraud because fraud by definition involves an abuse of the victim's trust. Baldwin cites the commentary to § 3B1.3, which indicates that the enhancement may only be applied when the defendant abuses a position of public or private trust "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, cmt. n.1. Baldwin argues that he was not a member of any professional organization and the joint venture agreements conferred no discretion on him regarding how Piscopo's "investments" were to be handled. He says he was only empowered to "move Piscopo's money from A to B and back again with interest, nothing more."

The government defends the application of the enhancement by citing a different section of the commentary which provides that the § 3B1.3 enhancement is warranted in cases where the defendant "provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not." U.S.S.G. § 3B1.3, cmt. n.2. As an example of such false pretenses, the commentary cites the case of a defendant who "perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker." *Id.* The government argues that Baldwin held himself out to Piscopo as a legitimate investment broker and that the district so found in sentencing him.

In the district court's findings and conclusions issued in connection with the judgment of conviction, the court never explicitly found that Baldwin held himself out as a "broker," although the court did enter this finding at the sentencing hearing. In her written decision after trial, the judge found that Baldwin offered Piscopo his "personal guarantee" that the investments were risk free and that Piscopo agreed to invest the money because of his faith in a 20-year friendship with Baldwin and his belief that Baldwin was honest. The question before us is whether Baldwin's exploitation of his long-standing personal relationship with Piscopo put him in a "position of trust" upon which the sentence enhancement may be based. We hold that it does.

In *United States v. Dorsey*, 27 F.3d 285, 289 (7th Cir. 1994), we reversed the imposition of an abuse of trust enhancement because the defendant's relationship with his victim was "a standard commercial agreement between a lending institution, a bank and an automobile dealership." Dorsey, the owner of an automobile dealership, defrauded the bank that supplied the "floor plan" loan financing for his stock by concealing from the bank the sale of some cars. We held that "to impose a sentence enhancement for abuse of a position of trust, there must be something more than a

mere contractual relationship between the parties." *Id.*
Baldwin tries to bring himself within this holding in *Dorsey*
by emphasizing the limited nature of the joint venture
agreements signed by Baldwin. The agreements, he argues,
were "mere contracts" akin to those in *Dorsey*.

But Baldwin's relationship with Piscopo went far beyond
the joint venture agreements. There is no question that
Baldwin succeeded in defrauding Piscopo by making reas-
suring representations and a "personal guarantee" that
specifically traded on the two men's long-standing personal
relationship. Under the terms of the guideline, a sentence
enhancement is warranted for abuses of public *or private*
trust. Abuse of a purely personal relationship of trust in
furtherance of a fraudulent scheme is a legitimate ground
for imposition of the enhancement. *See United States v.
Strang*, 80 F.3d 1214, 1220 (7th Cir. 1996) (affirming
application of abuse of trust enhancement where defendant,
although not a licensed investment broker, convinced vic-
tims to invest in a fraudulent scheme by befriending them).

More fundamentally, Baldwin is wrong that the applica-
tion of the enhancement here would effectively extend the
enhancement to all frauds. It is true that all frauds involve
deceit, but they may or may not involve the abuse of a
position of trust. Application of the enhancement turns not
on whether the scheme involved deceit, but whether the
defendant exploited a particular sort of relationship with
the victim. In *Davuluri* we observed that the consistent em-
phasis in our § 3B1.3 cases has been on the victim's confer-
ral of substantial discretion on the defendant to act on his
or her behalf. *Davuluri*, 239 F.3d at 909 (citing *United
States v. Hernandez*, 231 F.3d 1087, 1091 (7th Cir. 2000));
*see also United States v. Gellene*, 182 F.3d 578, 596 (7th Cir.
1999); *United States v. Hoogenboom*, 209 F.3d 665, 671 (7th
Cir. 2000). In this sense, the joint venture agreements cited
by Baldwin undermine his position on appeal. The agree-
ments (actually, the addenda setting forth the structure of

the investment "programs") give the Daric Corpora-
tion—controlled by Baldwin—complete control over the
management of Piscopo's "investment." One term of the
agreement, in fact, forbids Piscopo from initiating any con-
tact with the financial institutions that would be involved
in the "program." By the terms of these agreements and
based upon the long-standing personal relationship of trust
between the two men, Piscopo conferred upon Baldwin total
control over a large amount of his money. The district court
did not err in applying the two-level enhancement for abuse
of a position of trust.

### 3. Restitution Order

The district court ordered Baldwin to pay $3 million
in restitution to Piscopo. Baldwin contends that the resti-
tution order amounts to an ex post facto law in violation of
Section 10 of Article I of the Constitution. The restitution
order was issued pursuant to 18 U.S.C. § 3663A, which be-
came effective in 1996, after Baldwin committed his crimes.
*See* Mandatory Victim Restitution Act, Pub. L. No. 104-132,
Title II, § 204(a) (effective April 24, 1996). The law makes
restitution mandatory for certain crimes, including wire
fraud; the previous restitution statute gave courts discre-
tion and required consideration of the financial resources of
the defendant. Baldwin is broke and could not pay even the
$400 special assessment, which the district court therefore
waived. Baldwin argues that if the district court took into
consideration his financial situation under the old law, it
would never have ordered $3 million in restitution.

Baldwin acknowledges that we have already rejected the
argument that § 3663A violates the Ex Post Facto Clause.
*See United States v. Newman*, 144 F.3d 531, 537-38 (7th
Cir. 1998) (restitution is an equitable device for restoring
victims to their condition prior to when the crime took place
rather than a criminal sanction); *see also United States v.*

*Dawson*, 250 F.3d 1048, 1052 (7th Cir. 2001). He asks us to overrule *Newman* and adopt the contrary reasoning of other circuits. We decline the invitation—and not for the first time. In *United States v. Lopez*, 222 F.3d 428, 440 (7th Cir. 2000), we refused to reconsider *Newman* despite the disagreement of several other circuits. *See also Dawson*, 250 F.3d at 1052. Baldwin presents no compelling justification for us to revisit this issue.

### III.  Conclusion

For the foregoing reasons, we reject Baldwin's contention that the statute of limitations violation on Count 1 constitutes plain error. Because the evidence is sufficient to sustain the defendant's convictions for wire fraud, we AFFIRM Baldwin's conviction on all counts. We reject Baldwin's challenge to the imposition of a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of a position of trust, as well as his challenge to the restitution order. However, because Baldwin's original sentence exceeded the statutory maximum and the district court lacked authority to correct the error after the seven-day period specified in Rule 35(a) had expired, we VACATE the sentence and REMAND for resentencing.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*